John C. ECHOLS and Deanna O.
Echols, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.

No. 90–4231.

United States Court of Appeals,
Fifth Circuit.

July 15, 1991.

Bruce Locke, Shelley Cashion, Chamberlain, Hrdlicka, White, Johnson & Williams, Houston, Tex., for petitioners-appellants.

Abraham N.M. Shashy, Jr., Chief Counsel, I.R.S., Doris D. Coles, Gary R. Allen, Chief, Charles Bricken, Shirley D. Peterson, Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before GARWOOD and WIENER, Circuit Judges, and VELA *, District Judge.

WIENER, Circuit Judge.

Petitioners, John C. Echols (Echols) and his wife, Deanna O. Echols (collectively, Taxpayers), appeal from that portion of the decision of the United States Tax Court which held that Taxpayers were not entitled to claim a deduction in 1976 under 26 U.S.C. Section 165(a) (§ 165(a) of the Internal Revenue Code of 1954 as amended (I.R.C.) and in effect for the years at issue in this case) on the basis of abandonment. The tax court found that the Taxpayers had failed to establish that they had abandoned their partnership interest in 1976, or that the partnership had abandoned its sole asset, an unimproved tract of land, in that year. Finding that the tax court clearly erred in its conclusion regarding Taxpayers' abandonment of their interest in the Partnership, and that the tax court totally failed to address the issue of worthlessness, under I.R.C. § 165(a), we reverse.

### I.

Taxpayers petitioned the tax court for a redetermination of deficiencies determined by the government in the Taxpayers' income taxes for the years 1974 through 1977. The Tax Court held for the Taxpay-

ers with respect to 1974 and 1975 (DISC issues), but for the government with respect to 1976 and 1977 (I.R.C. § 165(a) loss issues). *Echols v. Commissioner,* 93 T.C. 553 (1989). The tax court found that an overpayment of income tax had been made by the Taxpayers for 1974 in the amount of $19,673.62, but that deficiencies in income tax existed for 1976 in the amount of $49,450 and for 1977 in the amount of $29,630.83. The government did not appeal the portion of the judgment adverse to it for 1974 and 1975, but Taxpayers timely filed a notice of appeal with respect to the I.R.C. § 165(a) loss issues for 1976 and 1977.

### II.

### OPERABLE FACTS

*A. Tax Court Findings of Fact.*

Prior to 1974, Taxpayers owned a 37.5% partner's interest in a Texas limited partnership (the Partnership). An identical interest was held by Scott Mann with whom Taxpayers had been involved in other projects. The Partnership's only asset was a tract of unimproved real estate in Houston, Texas (the Land). Mann secured a loan, guaranteed by Taxpayers, for the down payment on the Land. The remainder of the purchase price was financed by the vendors of the Land (Seller) on a nonrecourse basis. As the partners expected that a new highway proposed to be built adjacent to the Land would attract development, they anticipated that the Partnership would re-sell the property at a profit.

In 1974, local opposition stalled plans for construction of the new highway, and the real estate market in the Houston area was in a "slump," so the Partnership was unable to sell the Land. As a result, Mann was unable to service the debt he had incurred for the down payment of the property. On November 4, 1974, Mann and Taxpayers entered into an exchange agreement whereby, inter alia, Mann transferred his 37.5% interest in the Partnership to Taxpayers in exchange for their assumption of the recourse debt encumbering the

---

* District Judge of the Southern District of Texas, sitting by designation.

Land. Shortly thereafter, Taxpayers paid the assumed debt in full. Following the exchange, Taxpayers owned a 75% interest in the Partnership. By 1976, the remaining 25% was owned by Joe Smith.

In 1974 a third party (Developer) acquired a 50% interest in the Land [actually, Developer acquired a 100% interest in a specifically described portion of the Land constituting approximately half of its total area]. Developer made payments on the acquired tract in 1974 and 1975, but defaulted on his 1976 payment, notifying the Partnership that he would make no more payments on his installment purchase of that tract.

Upon learning of Developer's default, Echols called a meeting of the partners in May of 1976, at which he declared that Taxpayers would no longer contribute their 75% share of additional funds needed by the Partnership for mortgage and ad valorem tax payments on the Land. By that time the fair market value of the Land had declined to less than the principal balance of the outstanding non-recourse mortgage. When the Partnership's attempts to re-structure the underlying non-recourse debt failed, all efforts to sell the Land ceased. The Land was foreclosed on by Seller as mortgagee in February of 1977.

## B. Additional Uncontroverted Facts from the Record.

1. Developer's payments to the Partnership in 1974 and 1975 approximated the amounts needed by the Partnership to service its non-recourse debt to Seller, so the partners were not required to make significant infusions of capital as long as Developer made his payments.

2. At the partners' meeting in May of 1976, Echols offered to convey his interest in the Partnership to Smith or anyone else who would "step forward and assume his portion of the non-recourse payment obligation" but neither Smith nor anyone else showed any interest.

3. At that partnership meeting, Smith made the same declaration as did Taxpayers, i.e., that he would commit no additional funds to the investment, and would transfer his interest to anyone who wanted it.

4. The Partnership did not pay ad valorem taxes on the Land in 1976.

5. During 1976, the Partnership contacted Seller, explained the situation, and attempted to re-structure the non-recourse loan, but Seller rejected that suggestion out of hand.

6. After Seller refused to re-structure the non-recourse loan, the partners made no further contributions to the Partnership, and it in turn made no further mortgage payments to Seller, made no further ad valorem tax payments, and had no further contact with Seller or with the Land.

7. On January 10, 1977, Seller posted the property for foreclosure, and the foreclosure sale took place on February 1, 1977.

8. Until the exchange with Mann, Taxpayers' interest in the Partnership was that of limited partners. After the exchange Echols was substituted for Mann as General Partner.

## III.

## DISCUSSION

I.R.C. § 165(a) states the general rule that "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."

26 C.F.R. § 1.165–1(d)(1) (Reg. § 1.165–1(d)(1)) states:

"A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year."

In analyzing this case, two important distinctions must be kept in mind at all times: first is the distinction between the Taxpayers and the Partnership; this case involves the income tax returns of Mr. and Mrs. Echols as individual taxpayers, not those of the Partnership, albeit the net tax

results of the Partnership are passed on ratably to its partners. Second is the distinction between "abandonment" and "worthlessness"; either concept can, under proper circumstances, justify a deduction pursuant to I.R.C. § 165(a), but each is different in theory, and the elements of one are separate and distinct from the elements of the other. The tax court, and the government as well, failed to remain cognizant of those distinctions, failures that contributed in no small part to the reversible error in this case.

### A. Abandonment.

The tax court's determination regarding Taxpayers' loss deduction is a factual finding which will not be overturned unless clearly erroneous. *Laney v. Commissioner of Internal Revenue*, 674 F.2d 342, 345 (5th Cir.1982).

■ The tax court, the government, and the Taxpayers are in unanimous agreement that there is no requirement that a taxpayer relinquish title to an asset in order to establish a loss if such loss is reasonably certain in fact and ascertainable in amount. *Middleton v. Commissioner*, 77 T.C. 310, 322 (1981) *aff'd per curiam*, 693 F.2d 124 (11th Cir.1982). After acknowledging that rule, however, the tax court proceeded to analyze the instant case in light of *Middleton, Hopkins v. Commissioner*, 15 T.C. 160 (1950) and *Freeland v. Commissioner*, 74 T.C. 970 (1980), each of which concerned disposition of real estate by the title holder, ignoring the above mentioned distinctions that we are here concerned with abandonment by a partner of an interest in a partnership, not with a partnership's abandonment of real estate the title to which was held by such partnership. That the tax court in the instant case looked to the acts of the Partnership to determine if it had abandoned the Land rather than looking to the acts of Taxpayers to see if they had abandoned their interest in the Partnership is illustrated in the following excerpt from the tax court's opinion:

> "We think that [the Partnership's] failure to manifest its abandonment through some act apparent to those outside of the

partnership is a point which distinguishes this case from *Middleton....* While we do not hold that conveyance or even tender of title is necessary to consummate an abandonment, we do hold that for an abandonment to be effective for purposes of section 165(a), the abandoning party must manifest an intent to abandon by some overt act or statement reasonably calculated to give a third party notice of the abandonment. Petitioner[s] bear[ ] the burden of proof in this case, and [they have] produced no evidence of any such act or statement that was not confined to [the Partnership's] partners. We therefore find that the earliest identifiable event to which a recognizable loss may be tied is the actual foreclosure, which occurred after the year in which the loss was claimed."

*Echols*, 93 T.C. at 557-58.

From the foregoing quotation it is abundantly clear that the tax court's analysis of abandonment focused on the Partnership's abandonment of the real estate and not, as was required, on the Taxpayers' abandonment of their interest in the Partnership. It is inescapable, then, that the tax court clearly erred in concluding the absence of abandonment in the year in question because that court failed totally to consider the facts surrounding the Taxpayers' abandonment of their interest in the Partnership.

■ Mindful that, as noted by the tax court, conveyance or even tender of title is not necessary to consummate an abandonment, and focusing on Taxpayers' interest in the Partnership as the asset under scrutiny for purposes of our abandonment inquiry, we conclude that Taxpayers did in fact abandon their partnership interest in 1976, the year for which they claimed a loss under I.R.C. § 165(a). As found by the tax court, Echols called a meeting of the partners, one of whom was Smith. For purposes of Taxpayers' individual return, Smith was clearly a third party. At that Partnership meeting, Taxpayers' title to their interest in the Partnership was tendered to Smith or anyone else who would "step forward and assume" the non-re-

course payment on the Partnership's obligation. Smith, the third party, was told unequivocally that the Taxpayers, who were then 75% owners in interest of the Partnership, would contribute no further funds to the Partnership, a clear and unequivocal indication to Smith and the world that Taxpayers were "walking" from their ownership interest in the Partnership. And they kept that vow, never thereafter to return to acts of ownership toward or contributions to the Partnership.

Texas has an entity theory of partnership, but—unlike real estate or corporate stock—neither state law nor the I.R.C. or Treasury Regulations specify either physical methods or legal procedures for abandoning an interest in a partnership. Nevertheless, the declarations made by Taxpayers in 1976, coupled with their overt acts, were more than sufficient to constitute an abandonment of their interest in the Partnership in that year. Whether the Partnership itself abandoned the real estate in 1976, or only did so in 1977, when the Seller reacquired title to the Land by foreclosure, is in this instance totally irrelevant to the issue of Taxpayers' abandonment of their interest in the Partnership. We find that Taxpayers abandoned their interest in the Partnership in 1976.

*B. Worthlessness.*

Without explanation, the tax court failed entirely to address Taxpayers' alternative ground for their I.R.C. § 165(a) loss deduction—worthlessness. As an alternative holding, however, we conclude that the facts found by the tax court and reflected by the record demonstrate that Taxpayers' loss deduction of their interest in the Partnership on the basis of worthlessness is as compelling as abandonment.

■ As a general proposition, a taxpayer may claim a loss deduction under I.R.C. § 165(a) of the Code on either of two alternative grounds: abandonment or worthlessness. The test for abandonment espoused by the tax court—that the abandon-

ing party must manifest an intent to abandon by some overt act or statement reasonably calculated to give a third party notice of the abandonment—is obviously an objective test. Not so the test for worthlessness. The currently popular adage, "one man's trash is another man's treasure,"[1] best illustrates the subjective nature of worthlessness as a tax term of art.

■ More precisely, the test for worthlessness is a mixed question of objective and subjective indicia. Admittedly, a property cannot be treated as worthless for tax loss purposes if at the time it, objectively, has substantial value. But the more important question of *when* a property is worthless for purposes of a loss deduction under I.R.C. § 165(a) is, like beauty, largely in the eyes (more accurately, the mind) of the beholder (more accurately, the holder). The instant case is a good example.

■ Emphasizing again that the asset being tested for worthlessness is not the Land but the Taxpayers' 75% interest in the Partnership which owned the Land, we must determine *subjectively* just when it was that the Taxpayers deemed their Partnership interest worthless, then determine *objectively* whether that interest was valueless at such time.

When they took a loss deduction on their amended tax return for 1976, the Taxpayers manifested their subjective determination that their 75% interest in the Partnership had become worthless in that year. But they had also manifested their subjective determination of worthlessness *contemporaneously* when, at the Partnership meeting in 1976, Echols acknowledged—as found by the tax court—that (1) the Partnership's only asset was real estate with a fair market value less than the remaining balance on the non-recourse mortgage which encumbered it; (2) the Partnership's only independent source of income with which to service the non-recourse mortgage and pay ad valorem taxes had evaporated; and (3) Taxpayers declared that they would

---

1. Presumably derived from "It is the good man's treasure and the bad man's refuge." *The Way of Lao Tzu,* 62, or "What men call treasure and the

Gods call dross." James Russell Lowell, *Ode Recited at the Harvard Commemoration,* [1865], 4.

contribute no more funds to the Partnership to keep it afloat. At the same time, the Taxpayers tendered their interest to Smith and anyone else, gratis.

The Taxpayers' determination that their interest in the Partnership was worthless in 1976 is not diminished by the possibility that there might have been other investors "out there" who could just as legitimately have made a bona fide determination in an earlier year that an interest in the Partnership was worthless from their standpoints when considered in light of their other investments, cash flow, tax brackets, and innumerable other factors peculiar to their personal economic situations. Likewise, there might have been other, differently situated investors "out there" who could have looked at all of their economic indicators (including their own crystal ball!) and determined that in 1976 an interest in the Partnership was not yet worthless from their standpoint because of a willingness to gamble additional infusions of cash in the belief or hope that the Houston real estate market would rebound in time to prove the wisdom of their gamble. For, unlike abandonment, the timing of worthlessness is largely a judgment call by a taxpayer based on his own particular, highly personal set of economic factors, including tax effects. That the asset in question may have become virtually valueless in a prior year, or that the value may have been restored unexpectedly after being deemed worthless by the taxpayer, are not determinative of the "when" of worthlessness for that particular taxpayer.

■ Nonetheless, the subjective determination of worthlessness manifested by a Taxpayer's tax return position and, in some cases, by his contemporaneous actions or statements, cannot be the sole determinant of worthlessness in every case. In a hypothetical situation, a taxpayer's return position of worthlessness of an interest in, say, a partnership that owns liquid assets having undisputable market values substantially in excess of partnership liabilities could

have difficulty withstanding a challenge by the IRS, absent some strong, objective facts to the contrary.

■ The admittedly belabored point of this analysis is that the IRS cannot disallow an I.R.C. § 165(a) deduction by a taxpayer who can demonstrate his subjective determination of worthlessness in a given year, coupled with a showing that in such year the asset in question is in fact essentially valueless.[2] Proof by the IRS that the asset in question may have been of virtually no value in a prior year, or that, despite being of little or no value, the asset might have been deemed worthy of continued holding by some other taxpayer, even one similarly situated, would not defeat the bona fide determination of worthlessness by the taxpayer in the year he selects. Just as a taxpayer is entitled to exercise his own investment judgment and discretion in the timing of an overt act of abandonment, he is also entitled to the same exercise of judgment and discretion in determining when an asset is worthless to him, given a reasonable showing that the asset was in fact valueless at the time selected by the taxpayer—not that its fair market value necessarily fell to or below zero in that year.

As long ago as 1943, federal courts recognized that the timing of a deduction based on worthlessness is largely within the discretion of the taxpayer, given objective indicia of absence of value:

> In one case, as in another, the loss has taken place and the retention of bare legal title becomes a circumstance without significance that should not prevent the taxpayer from taking the deduction in the year in which the loss occurs *or permit him to postpone it at will to some later year when it will produce a larger reduction of tax liability.*

*Helvering v. Gordon,* 134 F.2d 685, 688 (4th Cir.1943) (emphasis added). *See also, Denman v. Brumbeck,* 58 F.2d 128, 129

---

**2.** We speak of the assets as being "virtually valueless," "essentially valueless" or "of virtually no value" to emphasize the de minimis rule that the taxpayer does not have to prove that a given asset is absolutely, positively without any value whatsoever. Barring an actual transaction, value can only be proved by appraisal and appraisals, being opinions, are inexact at best.

(6th Cir.1932) (loss allowable when taxpayer reasonably concluded his investment was totally lost).

In a more recent case on facts similar to those of the instant case, the tax court concluded that the taxpayer's interest in a partnership " ... became worthless in February 1978.... [The partnership] then ran out of operating funds and [the taxpayer] decided to contribute additional funds only to minimize [his] own losses prior to any future liquidation. Although [the partnership] did not go into formal bankruptcy, liquidation or dissolution, it is clear that [the partnership] was insolvent beyond any hope of rehabilitation by the end of 1978.... Thus we find that [the partnership's] insolvency during 1978 was the closed and completed event in 1978 to justify a deduction for a worthless partnership investment under Section 165." *Tejon Ranch Co. v. Comm'r*, 49 T.C.M. (CCH) 1357, 1363 (1985).

We agree with the following quotation from Taxpayers' appellate brief, applying the *Tejon Ranch* reasoning to the instant case:

> Notice that the tax court's analysis does not require an affirmative act from the taxpayer to demonstrate worthlessness of the partnership interest. Instead, the economic realities of the situation were probed to determine whether a worthlessness loss was available. In light of the tax court's finding [in the instant case] that the value of the Partnership's sole asset was less than the debt against it, Taxpayer has met his burden with respect to proof of worthlessness of his partnership interest.

We therefore hold in the alternative that Taxpayers were entitled to a loss deduction under I.R.C. § 165(a) of the Code for their interest in the Partnership on the basis of worthlessness as well as on the basis of abandonment.

## CONCLUSION

When the tax court focused on the timing and manifestation of the Partnership's abandonment of the Land rather than Taxpayers' abandonment of their interest in the Partnership, that court clearly erred. On the basis of the operable facts found by the tax court and contained in the record, we conclude that the Taxpayers abandoned their interest in the Partnership in 1976. The same facts demonstrate beyond bona fide challenge that for purposes of Taxpayers' loss deduction under I.R.C. § 165(a) for 1976, their interest in the Partnership was worthless in fact and was deemed worthless by Taxpayers. We therefore REVERSE the judgment of the tax court and REMAND this case for the limited purpose of permitting the tax court to recalculate Taxpayers' tax liability for 1976 and 1977, in accordance with this opinion, and to render a new or amended judgment consistent herewith.